UNION OIL OF CALIFORNIA, APPELLANT, *v.* BOARD OF EDUCATION OF THE GAHANNA-JEFFERSON PUBLIC SCHOOLS ET AL., APPELLEES.

---

[5] Kynast was not penalized for the check or his subsequent conduct vis-a-vis the fallen opponent.

(No. 86AP-645—Decided
March 10, 1987.)

*Bricker & Eckler, Charles F.
Glander* and *Richard S. Lovering,* for
appellant.

*Teaford, Rich, Belskis, Coffman &
Wheeler, Jeffrey A. Rich, Craig P.
Treneff* and *Steven Celebrezze,* for ap-
pellee Gahanna-Jefferson Board of Ed-
ucation.

*Michael Miller,* prosecuting attor-
ney, and *James R. Gorry,* for appellees
Franklin County Auditor and Franklin
County Board of Revision.

WHITESIDE, J. Appellant, Union
Oil of California ("Union Oil"), appeals
from a decision of the Board of Tax
Appeals, which concluded that the fair
market value of a shopping center
owned by Union Oil was $1,280,000 on
the tax lien date of January 1, 1982.
Union Oil raises the following assign-
ments of error:

"1. The Board of Tax Appeals'
decision and order is unreasonable and
unlawful because it erroneously found
that the entire sum paid by Union Oil
to Tempo III in settlement of a nine
million dollar lawsuit was solely for the
purchase of the land and buildings
comprising the real estate of the shop-
ping center.

"2. The Board of Tax Appeals'
decision and order is unreasonable and
unlawful because it ignored the only
record evidence of value, presented by
Robert J. Weiler, M.A.I., S.R.E.A.,
that the fair market value of the shop-
ping center was in the range of
$640,000 to $665,000.

"3. The Board of Tax Appeals'
decision and order is unreasonable and
unlawful because it is based on a DTE
Form 100 which neither presents nor
purports to present the fair market
value of the property.

"4. The Board of Tax Appeals'
decision and order is unreasonable and
unlawful because it was factually in er-
ror in finding that the DTE Form 100
'evidences that Union Oil purchased
the shopping center from Tempo III
for $1,280,000.'

"5. The Board of Tax Appeals'
decision and order is unreasonable and
unlawful because it failed to consider
the abnormal circumstances affecting
the true value of the real estate at
issue.

"6. The Board of Tax Appeals'
decision and order is unreasonable and
unlawful because it was against the
manifest weight of the evidence.

"7. The Board of Tax Appeals'
decision and order is unreasonable and
unlawful because it erroneously deter-
mined that Union Oil's purchase of the
shopping center as part of a settlement
agreement with Tempo III met the
Ohio Supreme Court's definition of an
arm's-length transaction.

"8. The Board of Tax Appeals'
decision and order is unreasonable and
unlawful because it ignored evidence of
the listing price of the land and build-
ings comprising the real estate of the
shopping center.

"9. The Board of Tax Appeals'
decision and order is void because:

"a. it orders the taxation of prop-
erty other than by uniform rule in
violation of Article XII, Section 2 of
the Ohio Constitution.

"b. it deprives appellant of its
property without due process of law, in
contravention of the Fourteenth

68

Amendment to the United States Constitution.

"c. it levies a tax other than in pursuance of law in contravention of Article XII, Section 5, of the Ohio Constitution.

"d. it denies to Appellant the equal protection of the laws in contravention of the Fourteenth Amendment to the United States Constitution and Article I, Section 2, of the Ohio Constitution."

The subject property, the Gahanna Shopping Center, is a 10.358-acre parcel of land located in the city of Gahanna. It is a relatively small shopping center site, having the common strip-store layout, which consists of a single line of businesses, placed side by side.

The pertinent history of the shopping center, according to largely undisputed testimony before the Franklin County Board of Revision and the Board of Tax Appeals, begins in April 1981. During that month, a general partnership, Tempo III, then owner of the shopping center, brought suit in the Franklin County Court of Common Pleas against Union Oil, the owner of a gasoline service station that adjoined the shopping center. The complaint contained allegations that Union Oil was liable, under theories of negligence, nuisance and trespass, for damages caused to the shopping center by gasoline contamination of the shopping center's ground soil. In its complaint, Tempo III demanded judgment against Union Oil for $8,125,000.

The shopping center, the complaint alleged, had been closed down temporarily in August 1979 because of the ground-soil gasoline contamination. The effect of that contamination became more permanent, however, in November 1981, when the Mifflin Township Fire Department ordered that the shopping center be vacated immediately and remain vacated until

the dangerous contamination of the ground soil was abated. A preliminary injunction issued by the Franklin County Court of Common Pleas in February 1982 confirmed the fire department's order. The shopping center, according to testimony, had been closed since the date of the fire department's order until at least the date of the hearing before the board of revision in June 1983.

In April 1982, Tempo III and Union Oil settled their lawsuit. Union Oil agreed to pay the lump sum of $1,563,500 in return for the agreement of Tempo III to dismiss its complaint against Union Oil. Also, as a part of the settlement, Union Oil agreed to assume ownership of the shopping center property. Union Oil did so on April 6, 1982. According to testimony before the board of revision, however, the parties could not agree on the price to be allocated to the real estate, although Tempo III made clear its intention to use a value of $1,280,000 as the sale price for the real estate because of federal income tax consequences.

Appellee, Board of Education of the Gahanna-Jefferson Public Schools introduced into evidence before the Board of Tax Appeals ("BTA") two documents reflecting the conveyance of the shopping center property to Union Oil. The first document, the general warranty deed that was used to convey the property from Tempo III to Union Oil, contains the conveyance fee tax stamp indicating that a conveyance tax of $1,280 was paid by the grantor, Tempo III, an amount of tax reflective of a $1,280,000 purchase price for the property.

The second document, the real property conveyance fee statement of value and receipt, the so-called Department of Tax Equalization ("DTE") Form 100, contains certain statements by the grantee's (Union Oil's) representative, the grantee being required

to declare the consideration given for the real property that was conveyed. See R.C. 319.202. Line 7(a) of the form requires the grantee to state the "[f]ull consideration including amount of all mortgages and liens" for the transaction in which the real property is being conveyed. On this line, Union Oil's representative indicated that cash alone was given in the transaction, for a total consideration of $1,280,000. Line 7(d) of the form requires the grantee to "[e]nter value of Personal Property or damages included in sales agreement, if any, and deduct from item 7(a)." Union Oil's representative entered a value of $1,280,000 on this line. Line 7(e) of the form requires the grantee to state the "consideration of Real Property on which the fee is to be paid." The form indicates that the amount to be entered on line 7(e) can be determined by subtracting the value listed on line 7(d) from the value listed on line 7(a). Union Oil's representative, however, performed no subtraction and merely left line 7(e) blank. If the subtraction were made, a zero value would have been reflected as the consideration for the real property conveyed. The form also indicates that the conveyance tax and the county transfer tax that were paid by the grantor, Tempo III, amounted to $2,560. It appears from the form, however, that the grantee is not obligated to fill in the part of the form that reflects the amount of conveyance and transfer taxes paid. An amount of conveyance and transfer taxes of $2,560 assumes a value of $1,280,000 as the purchase price of the real property conveyed.

The Franklin County Board of Revision denied the board of education's request that the fair market value of the shopping center for the tax year 1982 be increased from the then current appraised value of $729,890 to $1,280,000 to reflect the April 1982 sale of the property from Tempo III to Union Oil. Instead, the board of revision partially granted Union Oil's request to decrease the fair market value of the shopping center property, lowering the value to $680,000.

The BTA, however, reversed the determination of the board of revision and increased the fair market value of the shopping center property to $1,280,000. The BTA concluded that the $1,280,000 value contained in the DTE Form 100 was the purchase price for the shopping center property, and that the sale of the property represented an arm's-length transaction between a willing buyer and willing seller. In doing so, the BTA placed much emphasis on its decision not to accept the testimony of Carl Watson, the manager of Union Oil's division of real estate. Watson had indicated that the $1,280,000 value represented items other than the sale price of the property, such as damages attributable to the dismissal by Tempo III of its lawsuit.

Because the BTA believed that the purchase price was derived from an arm's-length transaction, it failed to give weight to the testimony of Robert Weiler, an appaiser who testified for Union Oil. Weiler testified that, in November 1980, he had performed an appraisal of the shopping center for its owner, Tempo III, and had appraised the shopping center's value in a price range from $800,000 to $825,000. This value did not consider the effect of the then existing ground-soil gasoline contamination. Weiler further testified that the cost of cleaning up the contamination, approximately $159,000, should be subtracted from the $800,000 to $825,000 figure to reflect the decrease in the property's fair market value on the tax lien date of January 1, 1982, due to the closure of the property. Thus, Weiler testified that the value of the shopping center property was $640,000 to $665,000 on

the tax lien date. Weiler also testified that the shopping center property was listed for sale with his real estate firm in early 1981, and that the asking price in the firm's offering circular for the shopping center was $860,000.

Union Oil's numerous assignments of error cover much of the same legal territory; therefore, it is proper for us to address the various contentions contained therein together.

The gist of Union Oil's appeal is that the BTA erred in relying solely on the values stated in the DTE Form 100 and, thus, ignoring other evidence of the property's value. Because the valuation of property represents a question of fact, an appellate court may not reverse a valuation decision of the BTA unless the record affirmatively shows that the board's decision is unreasonable or unlawful. See R.C. 5717.04 and the syllabus of *Bd. of Revision* v. *Fodor* (1968), 15 Ohio St. 2d 52, 44 O.O. 2d 30, 239 N.E. 2d 25. Because the board's decision in this case is unreasonable and unlawful, we find Union Oil's appeal to be well-taken.

We begin with the basic principle of property valuation, as stated in the syllabus of *Ratner* v. *Stark Cty. Bd. of Revision* (1986), 23 Ohio St. 3d 59, 23 OBR 192, 491 N.E. 2d 680:

"Although the sale price is the 'best evidence' of true value of real property for tax purposes, it is not the only evidence. A review of independent appraisals based upon factors other than the sale price is appropriate where it is shown that the sale price does not reflect true value. (*Columbus Bd. of Edn.* v. *Fountain Square Assoc., Ltd.* [1984], 9 Ohio St. 3d 218, 219, construed.)"

A sale price is the best evidence of the true value of property when it is the result of a recent, arm's-length transaction between a willing buyer and a willing seller. See paragraph one of the syllabus of *Conalco* v. *Bd. of Revision* (1977), 50 Ohio St. 2d 129, 4 O.O. 3d 309, 363 N.E. 2d 722.

For the BTA's decision to be reasonable, the evidence must reasonably support the conclusion that there was a definite, agreed-upon sales price, that the price was reached in an arm's-length transaction, and that the price was not influenced by factors other than the true value of the property.

Even assuming the evidence somehow supports the conclusion that the parties to the sale agreed to place a price of $1,280,000 upon the shopping center property, the question remains as to whether such a price in this case can be considered to be the result of an arm's-length transaction.

The parties, in debating whether the transaction was arm's length, focus exclusively on the willingness of the parties to the sale to transfer the shopping center. Union Oil contends that it was an unwilling buyer of the shopping center property since the purchase was made under the threat of a possibly expensive lawsuit. The board of education's argument, accepted by the BTA, assumes that only sales made under the compulsion of an express court order can be considered to result from a lack of willingness between the participants.

"Compulsion" and "willingness," however, are inexact legal terms. In the case of the settlement of a lawsuit, each party is under some compulsion to settle and not required to include damaged property in a settlement. Some transactions conducted under "peculiar" circumstances are not considered to be at arm's length, even though no compulsion is present, such as a sale of property between individuals who are related to each other. See the second paragraph of the syllabus of *In re Estate of Sears* (1961), 172 Ohio St. 443, 17 O.O. 2d 417, 178 N.E. 2d 240.

The sale of property in conjunction

with the settlement of a lawsuit involving a multitude of claims represents such a "peculiar" circumstance with respect to the value of the property transferred. The primary purpose of the parties under those circumstances is to settle all the claims involved in the lawsuit, not to seek the best possible bargain for the real property included in the settlement. A price reached during settlement negotiations in a lawsuit concerning damaged property and prolonged loss of use thereof is not the result of arm's-length bargaining and, therefore, cannot be used as the sole evidence of the true value of the property. Nor is the amount paid solely for the purchase of the property since damages for loss of use and depreciation of market value are also involved.

The lack of arm's-length bargaining between the parties was further indicated by the wide disparity between the $1,280,000 settlement and all other evidence of value of the property. The property for tax year 1981 had an assessed fair market value of approximately $729,000. The undisputed testimony revealed that Robert Weiler was retained by the previous owner, Tempo III, to appraise the property for possible sale, and that that appraisal yielded an opinion of a value of between $800,000 to $825,000, without any reduction because of the effect of the ground-soil contamination. Weiler also testified that Tempo III listed the property for sale in early 1981 with his real estate firm at an asking price of $860,000. Intervening between these valuations and the tax lien date of January 1, 1982 was the order of the fire department to close down the shopping center, an order that was confirmed the following February 1982 by the common pleas court. Also in evidence was the cost of correcting the contamination problem, $159,000, and the undisputed testimony of witnesses who indicated that the tenants of the shopping center had allegedly caused considerable additional damage as they vacated the premises.

In the face of these undisputed events, a payment of $1,280,000 appears to be the result of less than arm's-length bargaining for the purchase of the real property, as opposed to a settlement of all claims involved in the lawsuit. The BTA erred in concluding that the purchase of the real property was the result of an arm's-length bargain since it is wholly unreasonable to conclude that a property could increase in value by sums ranging from $420,000 to $551,000, despite a catastrophic closure order which left the property unusable on the tax lien date and which would require an expenditure of more than $150,000 to make the property usable again. There was absolutely no evidence that would permit a conclusion that arm's-length bargainers could reach such an inflated price. Thus, the only reasonable conclusion from the evidence was that the unusually high payment of $1,280,000 was the result of other than arm's-length bargaining for the purchase of the real property.

The sale price of property sold in conjunction with the settlement of a lawsuit should not be used as the best evidence of the fair market value of the property if it is shown that the price was reflective of factors other than the true value of the property. *Ratner, supra.*

A plaintiff in a lawsuit who is selling damaged property to the defendant as part of the settlement of that lawsuit will, of course, demand a price for the property that approximates the value of the property in its undamaged condition. Such a price, however, is not indicative of the value of the property in its current, damaged condition. The plaintiff-seller is in fact receiving three different "considerations" from the defendant-buyer when the damaged

property is "sold" in such a settlement: (1) the fair market value of the property in its current damaged condition; (2) damages to recompense the plaintiff for the lowered value of the property; and (3) damages to recompense the plaintiff for loss of use of the property while it was damaged. Such a price is not reflective of the true value of the property alone, so it is not evidence of the fair market value of the property. Only a proper allocation of the price to these three respective "considerations" results in evidence that would be indicative of the true value of the real property involved, assuming the price was from a recent, arm's-length sale. See *Heimerl v. Lindley* (1980), 63 Ohio St. 2d 309, 312, 17 O.O. 3d 200, 201-202, 408 N.E. 2d 685, 687-688.

The BTA chose not to accept Carl Watson's testimony that the purchase price for the shopping center property included other items because he lacked personal knowledge of the negotiations leading to the sale of the property and the settlement of the lawsuit. The BTA concluded that the record, without Watson's testimony, was "devoid" of any evidence that the $1,280,000 purchase price was for anything other than the shopping center.

The BTA acts as a finder of fact concerning the valuation of property, and its weighing of the credibility of witnesses and evidence in this area must be given wide discretion. See paragraph three of the syllabus of *Cardinal Federal S. & L. Assn.* v. *Bd. of Revision* (1975), 44 Ohio St. 2d 13, 73 O.O. 2d 83, 336 N.E. 2d 433. The board's statement that the record before it was "devoid" of evidence, however, is puzzling and patently incorrect. The tax representative of Union Oil expressly testified before the Franklin County Board of Revision that the sale of the property occurred as part of the settlement of a lawsuit claiming damages predicated upon several different theories. The record of the board of revision is part of the statutory record before the BTA. R.C. 5717.01.

Other evidence before the BTA also contradicts the assertion that the $1,280,000 price was for the shopping center property alone. Robert Weiler testified about his November 1980 appraisal for the former owner, which appraisal placed the value of the shopping center property, without consideration of the ground-soil contamination or the closure orders, in the $800,000 to $825,000 range. Weiler also testified to the price at which Tempo III had offered to sell the property before the closure orders, $860,000. The board also had before it the then current assessed fair market value of the property, approximately $729,000. This evidence of the property's value, regardless of Watson's testimony, raises a serious question of whether the $1,280,000 price reflected the value of the shopping center alone.

Finally, it is at best questionable as to whether there was any evidence supporting the BTA's conclusion that $1,280,000 was the agreed-upon purchase price of the shopping center property.

The BTA relied upon only two pieces of evidence to support its conclusion, the conveyance fee tax stamp on the general warranty deed and the statements by Union Oil's representative on the DTE Form 100. Although both a tax stamp and a DTE Form 100 can be relevant evidence, in this case the weight they properly can be given is negligible. The tax stamp on the deed could be relevant since the amount of tax paid reflects what the grantor assumed to be the purchase price. The tax stamp amount is entitled to weight only in the absence of other evidence as to the purchase price. Such evidence is especially suspect where,

as here, the sale was in settlement of a lawsuit seeking damages, admittedly, many times the true value of the real property. Additionally, all the other evidence as to true value of the real property indicates it to be substantially less than the amount reflected by the tax stamps.

The DTE Form 100 in many cases would provide much more probative evidence, since line 7(e) of the form expressly requests a declaration, by the grantee, of the consideration specifically attributable to the real property. See *Potato Processors Internatl. Corp. v. Franklin Cty. Bd. of Revision* (July 28, 1983), BTA No. 82-A-827, unreported. The form submitted in this case, however, reflects that the grantee, Union Oil, left that crucial line blank. Had line 7(e) been properly completed, it would have shown a *zero* amount given for real estate since Union Oil's representative had declared, in line 7(d) of the form, that all of the $1,280,000 given in the transaction was for "personal property or damages." On its face, this DTE Form 100 cannot support the conclusion that $1,280,000 was given for the shopping center property alone, any more than it supports a conclusion that the real property had no value.

Extrinsic evidence does not make the form any more conclusive. Evidence in the record does indicate that mistakes were made by Union Oil's representative. The "full consideration" for the transaction was $1,563,500, not the $1,280,000 amount listed in line 7(a) of the form. Also, Union Oil could not have been correct when it attributed all of the $1,280,000 amount to personal property and damages, since all the extrinsic evidence indicated that the real property had a value greater than zero but substantially less than $1,280,000. An acknowledgment that Union Oil's representative made mistakes in filling out the DTE Form 100, however, does not magically transform the ambiguous form into a document that unequivocally states the $1,280,000 was the consideration for the shopping center property alone. Rather, all the testimony and evidence in this case that could shed light on Union Oil's statements on the form indicate that $1,280,000 was *not* the agreed-upon price of the shopping center and that it was only the arbitrary amount selected by Tempo III for federal income tax purposes.

The BTA must have evidence supporting its decisions to raise or lower the value of property. The tax stamp on the deed coupled with the ambiguous DTE Form 100, without further evidence, cannot support the conclusion that $1,280,000 was the sale price for the property. There being no evidence supporting that conclusion, it was unreasonable for the board to conclude that $1,280,000 was the certain, agreed-upon price for the shopping center.

Given our above conclusions that there was not an "arm's-length" transaction for the sale of real estate, that the settlement amount does not reflect the true value of the shopping center property, and that there was no evidence to support the board's conclusion that $1,280,000 was the sale price for the property alone, it was unreasonable for the board to find the fair market value of the shopping center property to be $1,280,000 on the tax lien date of January 1, 1982. We find Union Oil's assignments of error, one through five and seven and eight, to be well-taken. Further, we note that Union Oil's ninth assignment of error is not well-taken, even though the failure to take into account the settlement of a lawsuit in conjunction with a sale of property could violate the constitutional prohibition against other than uniform taxation (*Ratner, supra*),

since the error of the BTA resulted from misapplication of the facts and statutory law rather than constitutional construction. Likewise, we find the sixth assignment of error not to be well-taken since the applicable test is unreasonableness or unlawfulness, rather than the manifest weight of the evidence.

Accordingly, for the foregoing reasons, the decision of the Board of Tax Appeals is reversed, and this cause is remanded for further proceedings.

*Judgment reversed and cause remanded.*

STRAUSBAUGH, P.J., and McCOR-MAC, J., concur.